# United States Court of Appeals

## For the First Circuit

Nos. 05-2065
     05-2129

UNITED STATES OF AMERICA,

Appellant/Cross-Appellee,

v.

JOHN FRECHETTE,

Defendant, Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch and Howard, Circuit Judges.

F. Mark Terison, Senior Litigation Counsel, with whom Paula D. Silsby, United States Attorney, was on brief, for appellant/cross-appellee.
John Paul DeGrinney, with whom DeGrinney Law Offices was on brief, for appellee/cross-appellant.
William S. Harwood, Valerie A. Wright, Verrill Dana, LLP, Dennis Henigan, Elizabeth Haile, and Brady Center to Prevent Gun Violence on brief for Brady Center to Prevent Gun Violence, Southern Maine Chapter of Million Mom March, Maine Citizens Against Handgun Violence, Maine Coalition to End Domestic Violence, National Council of Women's Organizations, Chief Mathew Baker, Chief Timothy Burton, Sheriff Mark Dion, Chief Edward Googins, Chief William Welch, and Chief Don Winslow, amici curiae.

August 2, 2006

**LYNCH**, **Circuit Judge**.    On October 16, 1996, John Frechette was convicted in state court in Lewiston, Maine, after pleading no contest to a charge that he had assaulted his then live-in girlfriend.  This offense was a misdemeanor, see Me. Rev. Stat. Ann. tit. 17-A, § 207, and  Frechette was sentenced to a jail term of thirty days, which was immediately suspended, and to a one-year term of probation.

In 1996 Congress passed, as part of the Omnibus Consolidated Appropriations Act of 1997, the Lautenberg Amendment to the Gun Control Act of 1968 ("the Amendment"), Pub. L. No. 104-208, § 658, 110 Stat. 3009, 3009-371  to -372 (1996) (codified as amended at 18 U.S.C. §§ 921, 922, 925).  See United States v. Hartsock, 347 F.3d 1, 4-5 (1st Cir. 2003).  The Amendment was intended, in part, to address the growing national recognition of the importance of deterring domestic violence.  See id. at 5 (citing sources).  It expressed Congress's recognition that firearms were frequently used in domestic violence attacks.  See id.

Congress also recognized that there was a loophole in the law, which it moved to close.  Although earlier law had restricted the possession of firearms by those convicted of domestic violence felonies, no such restrictions existed as to possession of firearms by persons convicted of domestic violence misdemeanors.  See id. The Amendment eliminated this disparity.    Under 18 U.S.C.

-2-

§ 922(g)(9), it is now unlawful for a person "who has been convicted in any court of a misdemeanor crime of domestic violence" to, inter alia, "possess in or affecting commerce, any firearm or ammunition."  The statute defines "misdemeanor crime of domestic violence" as an offense that:

> (i) is a misdemeanor under Federal, State, or Tribal law; and
>
> (ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

18 U.S.C. §  921(a)(33)(A).  This provision is subject to some affirmative defenses, two of which are described below and are involved in this appeal.

On February 9, 2005, a federal grand jury returned a superseding indictment charging Frechette with having "knowingly possessed in and affecting commerce a firearm, specifically a Phoenix Arms, .22 caliber pistol," in violation of 18 U.S.C. §§ 922(g)(9) and 924(a).[1]  There seems to be little dispute Frechette had a firearm; his main defense was that his misdemeanor

---

[1]    18 U.S.C. § 924(a) sets out the penalties for, inter alia, the knowing violation of § 922(g).

domestic violence conviction did not count as a predicate offense within the meaning of the statute.

Frechette did not argue that his 1996 Maine offense was not a "misdemeanor crime of domestic violence," as defined at 18 U.S.C. § 921(a)(33)(A). Instead, he moved to dismiss the indictment on the basis that the 1996 offense did not count as a "conviction" within the meaning of 18 U.S.C. § 921(a)(33)(B)(i)(I) and (II), because it was secured without his having "knowingly and intelligently waived [both] the right to counsel," 18 U.S.C. § 921(a)(33)(B)(i)(I), and "the right to have the case tried by a jury," id. § 921(a)(33)(B)(i)(II).

The text of the affirmative defenses Frechette invoked provides:

> (i) A person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] for purposes of this chapter, unless --
>
>> (I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
>>
>> (II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
>>
>>> (aa) the case was tried by a jury, or
>>>
>>> (bb) the person knowingly and intelligently waived the right to

> have the case tried by a jury, by
> guilty plea or otherwise.

Id. § 921(a)(33)(B)(i).

The statute also sets forth another affirmative defense, which is set out just below those already described. See id. § 921(a)(33)(B)(ii). That defense is not at issue here, but is pertinent to understanding the provisions that are at issue:

> (ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

Id.

In response to Frechette's motion to dismiss the indictment, the government entered into evidence a transcript of Frechette's October 16, 1996 state-court appearance on the assault charge. The transcript showed that the state court conducted a "mass arraignment," in which it brought a large group of defendants into the courtroom and advised them collectively about their rights. Frechette does not dispute that he was among that group of defendants.

Among other things, the court informed Frechette and the others that they had the right to a jury trial:

-5-

Now here are your rights. Since you're here on a criminal charge, I want to advise you, first and foremost, that you're all presumed innocent until proven guilty. Under our system of justice, and the state and federal constitution[s], you are entitled to a trial by judge or jury. You are entitled to have the State, and by the State, I mean the law enforcement agency that has arrested you and charged you with a crime, to come to court and prove their case to a judge or jury. . . .

The court also informed the group of defendants that each

of them had the right to counsel:

The third right and the last right that I want to explain to everybody is your right to an attorney. If any of you are here and there is a probability or a possibility that you could be facing jail if you are convicted of the crime that you are being charged with here, I would advise you to get a lawyer or get legal advice. Also, if you can't afford a lawyer, depending on your financial circumstances, you can ask me to appoint a lawyer at the State expense for you. Here's how that happens. You let me know. I'm obviously going to let you know how serious the offense is and you are going to be asked about whether you are going to represent yourself, hire a lawyer, or ask for a court appointed lawyer. If you ask for a court appointed lawyer, you're gonna be screened this morning by a financial screening officer who will interview you and decide whether you meet the guidelines for a court appointed lawyer. If you meet the guidelines, a lawyer will be appointed who practices within our jurisdiction here. . . . If you don't qualify, that means you will have to hire your own lawyer or represent yourself. Please understand the case doesn't go away because you don't get a court appointed lawyer. You still have to face the charges. . . .

Finally, the court explained to the group that each defendant could enter one of three pleas, and that each would waive the rights to a trial and to counsel by pleading "guilty" or "no contest":

> I am going ask you to enter one of three pleas: Guilty, Not Guilty, No Contest. Guilty means what it says. It means that you will end up saying "I'm Guilty" - you admit the charge and we will impose a sentence this morning. If you plead Not Guilty, you are asking for a trial and I will give you a date for your trial. If you plead No Contest that means that you don't want to plead Guilty, but you don't want a trial and you want to dispose of the matter and you want to get rid of it today. There is still a conviction. In other words, I make a finding of guilt. The only difference is that you haven't pled guilty, you're still convicted without a trial. Those of you who plead Guilty and those of you who plead No Contest waive your right to a trial. Obviously, you're not going to have a trial. You waive your right also to get the advice of a lawyer, so please understand those consequences before you decide to plead Guilty. . . .
>
> . . . .
>
> Now if you plead Not Guilty you'll get a date for trial - I told you that. Then we're going to hand you three pieces of paper . . . . Page One is your ticket to a jury trial. Since it's a criminal offense, you have a right to say, "I want a jury trial instead of a judge trial." The reason you're in district court is because all of you are here on Class D and E crimes. . . . If you want a jury trial, you take the first piece of paper that is handed to you this morning and within three weeks of today's date, sign it and bring it to the clerk in the lobby. . . . If that happens, your case is transferred across the river and goes to the Superior Court in Auburn and

-7-

you'll be notified by that court of the time and date of your trial by jury. If you don't file it within three weeks, you have to be here on the day I give you for a trial before a judge in this court.

Following the mass arraignment, the court engaged in an individual plea colloquy with Frechette. The court observed that Frechette had already pleaded "not guilty" at his initial appearance in state court and that he was presently before the court on a bench warrant for not showing up for trial.[2] The court advised Frechette that he "ha[d] a right to either ask for a new court date if you want to do so," at which point Frechette seems to have interrupted and said "no." Frechette then indicated that he wanted to change his plea to "no contest," and the court warned him that by so doing, he would be waiving his "right to trial." The court did not, however, as it had done earlier at the mass arraignment, invoke the phrase "<u>jury</u> trial":

> Court: All right, Mr. Frechette, you have already pled Not Guilty. This was a bench warrant for not showing up to your trial and

_____

[2] There is some confusion in the record about what happened at Frechette's initial arraignment, which took place on December 13, 1995. According to the state court docket, Frechette pleaded guilty on December 13 and the case was continued for sentencing to November 7, 1996. However, the docket also indicates that a hearing notice was issued to Frechette on September 3, 1996, apparently ordering him to appear in court on October 3, 1996. He failed to appear on that date, and a bench warrant was issued for his arrest. He was then arrested on October 4 and brought into court on October 16, whereupon the court stated, and Frechette did not deny, that he had actually pleaded "not guilty" at the December 13 arraignment.

you have a right to either ask for a new court date if you want to do so.

Frechette: No.

Court: Do you want to change your plea?

Frechette: No contest.

Court: Do you want to change your plea to No Contest? Do you understand by doing that you waive your right to trial. Right?

Frechette: Yes.

In the course of the colloquy, the court also noted that Frechette did not qualify financially for a court-appointed lawyer. It informed Frechette that by pleading "no contest," he would be waiving his right to counsel:

Court: Your right to the advice of a lawyer? Does he get a court appointed lawyer? No, he didn't qualify. Okay. Do you understand that by pleading ["no contest"] that you waive your right to trial and the advice of a lawyer? All right?

Frechette: Yup.

Court: Okay. Do you want to have him waived, please?

Court Officer: This is a waiver of counsel I'm going to read to you[:]

"I am the person charged in this proceeding. I am fully aware of my right to have my attorney of my own choosing or, if I am unable to afford an attorney, to have an attorney appointed by the court at public expense. I do not desire an attorney and hereby waive my right to be represented by an attorney."

            Do you understand what I read to you, sir?
            Having read that to you, you can sign right
            here, please.

Frechette does not dispute that he signed the waiver after this
exchange.

        Frechette conceded that the transcript provided by the
government was "[a]n accurate transcript of the plea colloquy and
advisement of rights for the predicate offense."[3]  Nevertheless, as
part of his motion to dismiss the indictment, he requested an
evidentiary hearing, at which he sought to present evidence, inter
alia, of his educational background and lack of sophistication
about the criminal justice system, the underlying facts of his
predicate domestic violence offense, his lack of recall about being
notified by the state court of his rights to counsel and to a jury
trial, and his financial circumstances at the time of his "no
contest" plea, which allegedly precluded him from securing paid
counsel.  The magistrate judge, without ruling on Frechette's
motion to dismiss the indictment, rejected his motion for an
evidentiary hearing in a memorandum decision, to which Frechette
timely objected.

        The district court subsequently allowed for oral
argument, both on the magistrate judge's order denying Frechette an

_____

        [3]    Frechette  initially  challenged  the  accuracy  of  the
transcript.   But he made clear to the district court at oral
argument on his motion to dismiss that he was withdrawing his
objection.

                              -10-

evidentiary hearing and on Frechette's motion to dismiss the indictment. In an opinion issued on June 10, 2005, the district court overruled Frechette's objection to the magistrate judge's order denying him an evidentiary hearing, but allowed his motion to dismiss. See United States v. Frechette, 372 F. Supp. 2d 669, 676 (D. Me. 2005). The court entered a judgment of discharge, pursuant to Rule 32(k)(1) of the Federal Rules of Criminal Procedure, on June 13, 2005.

In its June 10 opinion, the district court held: (1) that the question of whether Frechette "knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise" under 18 U.S.C. § 921(a)(33)(B)(i)(II)(bb), was to be determined by the law of the state of the predicate conviction and not by federal law, see Frechette, 372 F. Supp. 2d at 674; (2) that if federal constitutional law were the appropriate standard, then the waiver of jury trial would be valid, see id. at 675, but that under the law of Maine, specifically State v. Rowell, 468 A.2d 1005 (Me. 1983), the waiver was invalid, see Frechette, 372 F. Supp. 2d at 675; (3) that Frechette was not entitled to an evidentiary hearing, see id. at 673; and (4) that Frechette had not shown that his waiver of counsel in the predicate state proceeding was invalid under 18 U.S.C. § 921(a)(33)(B)(i)(I), see Frechette, 372 F. Supp. 2d at 673. Each side appeals from the issue(s) it lost.

-11-

The key question on appeal is whether the jury waiver question is determined by reference to state law standards or to the federal constitutional standard for waiver. We review this question of statutory interpretation de novo. United States v. Rosa-Ortiz, 348 F.3d 33, 36 (1st Cir. 2003).

We hold that the validity of a waiver of jury trial for purposes of 18 U.S.C. § 921(a)(33)(B)(i)(II)(bb) is to be evaluated under the federal constitutional standard and that Frechette validly waived that right. We also hold that the district court was correct to conclude that Frechette was not entitled to an evidentiary hearing and that Frechette validly waived his right to counsel. As a result, we reverse the district court solely on the question of whether Frechette validly waived his right to a jury trial, vacate the order of dismissal, and remand for proceedings consistent with this opinion.

I.

Interpretation of Statutory Provision
Regarding Waiver of Jury Trial

Our task is to interpret the federal statute. A bit more precision is in order. The statute does define the standard for the waiver of the jury trial right: the standard is whether the person "knowingly and intelligently" waived the right to trial by jury. The question is whether the phrase "knowingly and intelligently" is to be measured by federal or state standards.

-12-

The question becomes meaningful in situations in which the standards turn out to be different. We can think of at least two such situations. The first is when the federal constitutional standard has been met, but state law, applying a more defendant-friendly standard of "knowingly and intelligently," has not been met. The district court thought that was the situation here.[4]

The second (at least hypothetical) situation is one in which the federal constitutional standard has not been met, but a less defendant-friendly state standard for waiver has been met. State law, after all, may give a defendant a right to a jury trial where one is not mandated by the Sixth Amendment, see Duncan v. Louisiana, 391 U.S. 145, 159-61 (1968) (drawing a distinction between "serious crimes" and "petty offenses," and holding that the Sixth Amendment entitles defendants to a jury trial only for serious crimes); see also Baldwin v. New York, 399 U.S. 66, 69 (1970) (holding that "no offense can be deemed 'petty' for purposes of the right to trial by jury where imprisonment for more than six months is authorized"), and where a state has chosen to do so, it is conceivable that it might allow a defendant to waive the right by some procedure that is less stringent than that required under

---

[4] Because we hold that the federal constitutional standard, and not state standards, applies, it is unnecessary for us to examine whether, as the government argues, the district court erred in construing Maine law, as articulated in Rowell, as providing a standard more favorable to defendants than that provided by the federal Constitution.

-13-

federal law for waiving a constitutional right to a jury trial for serious crimes.[5]

Frechette's argument would have this court apply state law standards for what constitutes "knowing[] and intelligent[]" waiver, regardless of whether the particular state law being invoked affords greater or lesser protection to defendants than would the federal constitutional standard. Under his theory, Congress would have to have intended for there not to be one national standard for "knowing[] and intelligent[]" waiver, but a large number of state-created standards, some of which may be more defendant-friendly and others of which may be more defendant-hostile.

The government's position is that the statute requires the application of a uniform federal standard. Use of normal principles of statutory interpretation favors this reading, although the text is not so clear as to eliminate all questions. Furthermore, Frechette argues that the because the statute does at

---

[5]    We make no comment as to the legality of such a practice. We note only that at least one state has argued before its state supreme court that this practice would be permissible under the federal Constitution. See Mills v. Municipal Court, 515 P.2d 273, 2810 n.8 (Cal. 1973) (en banc) (noting the government's argument "that the trial record need only show that a defendant was aware of, and voluntarily and knowingly waived, his right to jury trial in those misdemeanor proceedings which are 'non-petty' under federal standards"; opining that "this contention may accurately reflect the demands of the federal Constitution"; but rejecting the government's position "pursuant to our supervisory authority over state criminal procedures").

times incorporate state standards, national uniformity in the federal statutory scheme to control domestic violence is not the consistent guiding principle throughout the statute. Still, we agree with the government.

First, when a federal statutory term such as "knowingly and intelligently" is used, ordinarily the interpretation is supplied by federal law, not state law, absent some express language to the contrary. See Jerome v. United States, 318 U.S. 101, 104 (1943) ("[W]e must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law."); see also Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 119-20 (1983) (noting that "'in the absence of a plain indication to the contrary, . . . it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law[,]'" because "the application of federal legislation is nationwide and at times the federal program would be impaired if state law were to control" (quoting NLRB v. Natural Gas Util. Dist., 402 U.S. 600, 603 (1971))), superseded by statute, Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), as recognized in Molina v. INS, 981 F.2d 14, 22 (1st Cir. 1992); United States v. Ayala-Gomez, 255 F.3d 1314, 1319 (11th Cir. 2001) (per curiam) ("Words in federal statutes reflect federal

-15-

understandings, absent an explicit statement to the contrary, even if a state uses the word differently.").

Second, the very phrase "knowingly and intelligently" can easily be read as a shorthand encapsulation of the federal constitutional standard.  See, e.g., Patton v. United States, 281 U.S. 276, 312 (1930) ("Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant."), abrogated on other grounds by Williams v. Florida, 399 U.S. 78 (1970); accord United States v. Leja, 448 F.3d 86, 96 (1st Cir. 2006) (upholding validity of jury trial waiver, so long as it was "knowingly, voluntarily, and intelligently" made); cf. Edwards v. Arizona, 451 U.S. 477, 482 (1981) (noting that "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege"); Boykin v. Alabama, 395 U.S. 238, 242 (1969) (requiring that a plea be "intelligent and voluntary"); Johnson v. Zerbst, 304 U.S. 458, 464 (1938).

Third, the structure of the statute favors the government's construction that the jury waiver question is to be

analyzed under the federal constitutional standard. The affirmative defense under discussion has two subsections, (I) and (II):

> (i) A person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] for purposes of this chapter unless --
>
>> (I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
>>
>> (II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
>>
>>> (aa) the case was tried by a jury, or
>>>
>>> (bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

18 U.S.C. § 921(a)(33)(B)(i). The parties agree that in subsection (I), which deals with the right to counsel, the term "knowingly and intelligently waived" is to be analyzed under the federal constitutional standard. Only in subsection (II), which deals with the jury trial right, does Frechette argue that the very same term is to be analyzed under state law. There are two prongs to his argument. First, he points out that subsection (II) refers to "the jurisdiction in which the case was tried" to determine whether there was any jury trial right at all. Second, he notes that the second affirmative defense to 18 U.S.C. § 922(g)(9), set out in the

-17-

paragraph immediately below the affirmative defense under discussion, excludes as predicate convictions those offenses for which the person "has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under [such an] offense)." 18 U.S.C. § 921(a)(33)(B)(ii). The reasoning, propounded by Frechette and employed by the district court, is that if Congress explicitly referred to the law of the jurisdiction in which the offense was committed to determine whether there is a jury trial right at all and to determine whether there is a loss of civil rights for a certain offense, Congress implicitly meant all issues concerning the right to a jury trial, including waiver, to be resolved by looking to state standards. On balance, we think this approach is wrong.

On its face, the separate restoration of civil rights provision itself has nothing to do with the right to a jury trial.

That Congress referred to state law to define whether there was any jury trial right at all has an independent rationale. As noted earlier, states may provide jury trials even when they are not compelled by the federal Constitution to do so. It is easier to administer the federal statute by simply accepting the states' choice to give or not to give a jury trial; that is a background fact against which the whole provision operates.

But, as this case demonstrates, it is not easier to administer the federal statute by then looking to state law to

-18-

determine what is meant by a "knowing[] and intelligent[]" waiver of the right to a jury trial.[6]  A single, well-understood federal standard for waiver of jury trial is clearly easier for federal courts to apply than would be a patchwork of conflicting and changing state laws.  See Jerome, 318 U.S. at 104 (noting "the desirability of uniformity in application" of federal criminal laws); cf. Dickerson, 460 U.S. at 111-12 (holding that "[w]hether one has been 'convicted' within the language of the gun control statutes is necessarily . . . a question of federal, not state, law, despite the fact that the predicate offense and its punishment are defined by the law of the [s]tate").

In the statute, both references to state law (in relation to whether a jury is available and to whether there is a loss of civil rights) are isolated structurally and grammatically from the subsection, § 921(a)(33)(B)(i)(II)(bb), setting forth the requirement of a "knowing[] and intelligent[] waive[r]" of the jury trial right.  It is tempting to credit this arrangement as evidence that Congress knew how to direct attention to state law standards when it so desired and that it purposefully did not do so as to waiver of the jury trial right.[7]  See Barnhart v. Sigmon Coal Co.,

---

[6]    Both parties contended at oral argument that Maine law clearly favors their respective positions.

[7]    Despite the government's extensive use of legislative history to support its position, we see no need to go down this road to resolve the issue.

534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting Russello v. United States, 464 U.S. 16, 23 (1983))).

The text, while not entirely plain, is more consistent with an intent by Congress that the term "knowingly and intelligently" be interpreted by the federal constitutional standard, and not by state standards. We have already mentioned that federal statutes are usually defined by federal law, that there is no express reference to state law in this particular provision where one might otherwise expect one, and that the statute is more easily and better administered by use of one standard -- and a familiar one at that. The view that state law governs the content of "knowing[] and intelligent[] waive[r]" of the jury trial right also, as we have described, raises the risk of lowering protections for defendants in situations in which state law standards for waiver are more relaxed than those set forth by the federal constitutional standard. That is all the more reason to give the statute its most natural reading, that the "knowing[] and intelligent[]" standard is to be determined by the federal constitutional standard. This appears to be the practice of other circuits. See United States v. Bethurum, 343 F.3d 712, 718 (5th

Cir. 2003) (applying, without discussion, federal constitutional standard to the question of whether a jury trial waiver was "knowing[] and intelligent[]" within the meaning of 18 U.S.C. § 921(a)(33)(B)(i)(II)(bb)); United States v. Jennings, 323 F.3d 263, 275-76 (4th Cir. 2003) (same).

## II.

### Waiver of Rights to Jury Trial and to Counsel Under Federal Law

We analyze, under the federal standard, whether Frechette "knowingly and intelligently" waived his rights to jury trial and to counsel. The district court's alternative holding was that if the federal standard were applied, then Frechette's waiver of jury trial was valid. The court also held that Frechette's waiver of his right to counsel was valid. "We review factual findings by the district court for clear error" and "the determination of whether a waiver of rights was voluntary de novo." United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004).

A.      Waiver of Right to Jury Trial

Frechette's underlying state conviction was a "Class D" misdemeanor, see Me. Rev. Stat. Ann. tit. 17-A, § 207, punishable by a term of imprisonment of up to one year under Maine law, id. § 1252(2)(D).   The  Maine  Constitution,  like  the  federal Constitution, provides the right to a jury trial for such an offense.   See State v. Sklar, 317 A.2d 160, 165 (Me. 1974) (construing the Maine Constitution, see Me. Const. art. I, § 6, to

-21-

guarantee the right to a jury trial in all criminal prosecutions);
see also Baldwin, 399 U.S. at 69 (holding that the Sixth Amendment
guarantees the right to a jury trial in the case of any offense for
which imprisonment for more than six months is authorized). A
defendant, however, may waive the jury trial right. Adams v.
United States ex rel. McCann, 317 U.S. 269, 275 (1942).

"[W]hether or not there is an intelligent, competent,
self-protecting waiver of jury trial by an accused must depend upon
the unique circumstances of each case." Id. at 278. "In making
this determination, courts may consider a variety of factors
showing that a waiver is validly given," including, but not limited
to, "the extent of the particular defendant's ability to understand
courtroom discussions regarding jury waiver." Leja, 448 F.3d at
93-94.

Here, the state court clearly advised all the defendants
present at the mass arraignment that each was "entitled to a trial
by a judge or jury," that each could exercise the right to a jury
trial by submitting a written request to the clerk within three
weeks, and that each would be giving up the right to any type of
trial by pleading "no contest" or "guilty." Frechette conceded
that he was present at the mass arraignment, and the district court
found that "he did hear the mass warning and nevertheless told the
[state court] judge that he wanted to plead ['no contest']."
Frechette, 372 F. Supp. 2d at 675-76.

On appeal, Frechette points to his limited education and argues that "there wasn't even an indication that [he] understood either the facts or the law applicable"; however, nothing in the record shows that he did not hear or understand the state court's instructions. There was thus no clear error in the district court's finding to the contrary.

That the state court did not specifically say the words "jury trial" to him during his individual colloquy, after repeatedly using it during the mass arraignment, does not render his waiver invalid, so long as the waiver was knowingly and intelligently made. See Leja, 448 F.3d at 93 (holding that even "the absence of colloquy by itself does not require reversal where the evidence establishes that the defendant's waiver [of jury trial] was knowingly and intelligently made" (emphasis added)). Based on this record, we conclude that Frechette "knowingly and intelligently waived the right to have the case tried by a jury" within the meaning of 18 U.S.C. § 921(a)(33)(B)(i)(II)(bb).

B.      Waiver of Right to Counsel

This leaves Frechette's cross-appeal, in which he argues that his domestic violence misdemeanor does not qualify as a predicate conviction because he was deprived of his right to counsel.

"The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the

criminal process. The entry of a guilty plea, whether to a misdemeanor or a felony charge, ranks as a 'critical stage' at which the right to counsel adheres." Iowa v. Tovar, 541 U.S. 77, 80-81 (2004) (citations omitted). The right to counsel, too, can be waived. Id. at 81.

"Waiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances.'" Id. (quoting Brady v. United States, 397 U.S. 742, 748 (1970)). "The constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." Id. The defendant invoking the affirmative defense under 18 U.S.C. § 921(a)(33)(B)(i)(I) bears the burdens of production and persuasion to show that he did not knowingly and intelligently waive the right to counsel in the predicate misdemeanor domestic violence offense. Hartsock, 347 F.3d at 9.

The district court found that Frechette had conceded that the state court advised him of his right to counsel at his October 16, 1996 appearance. Frechette, 372 F. Supp. 2d at 671. At the mass arraignment, the state court informed the defendants that each had the right to an attorney, and that if "there is a probability

-24-

or a possibility that you could be facing jail if you are convicted of the crime that you are being charged with here, I would advise you to get a lawyer or get legal advice." The court also told the defendants that each could request court-appointed counsel, provided that each qualified financially. Subsequently, in the individual plea colloquy, the court inquired into Frechette's eligibility for a court-appointed lawyer, noted that he did not so qualify, and warned him personally that by pleading "no contest," he would "waive [his] right to . . . the advice of a lawyer." Frechette indicated verbally that he understood, and he also signed a written statement to that effect, which was also read aloud to him.[8] Frechette "kn[ew] what he [was] doing and [made] his choice . . . with eyes open." Adams, 317 U.S. at 279.

Frechette argues, however, that his choice was effectively made with his hands tied and so was involuntary. He contends that the state court erred in determining that he did not qualify financially for court-appointed representation. He points to the state court docket, which shows that in his initial appearance on December 13, 1995, he had requested court-appointed counsel, but his motion was denied because his "income exceed[ed] guidelines for court appointment." He alleges that his financial circumstances changed for the worse after his initial appearance,

---

[8] The signed waiver is not part of the record; however, Frechette does not dispute that he signed it.

such that at the time of his "no contest" plea in October 1996, he should have been deemed eligible for court-appointed counsel.

He thus asked the federal district court, almost ten years after the fact, to make an independent examination of his financial circumstances at the time of his "no contest" plea to determine whether he was, for all practical purposes, denied his right to counsel because he was unable to afford one.[9]

The district court denied his request to reopen the issue of his financial eligibility, and was correct in doing so. As always, the decision to convene an evidentiary hearing is at the discretion of the trial judge, reversible only if that discretion was abused. See United States v. Panitz, 907 F.2d 1267, 1274 (1st Cir. 1990). No such abuse took place here.

Frechette never challenged the state court's determination, either at his December 1995 appearance or at his October 1996 plea colloquy, that he was not eligible for court-appointed counsel. His financial information as of the time of the domestic violence conviction is not in the current record,

_____

[9] Although Frechette indicated in his request for an evidentiary hearing that he intended to present evidence that "[h]e does not recall being advised of his right to a trial by jury," his cross-appeal focuses solely on whether the district court erred in not allowing him an evidentiary hearing on the waiver of counsel issue. To the extent that he does raise an argument concerning the appropriateness of an evidentiary hearing with respect to the jury trial issue, it is waived for lack of appellate development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

and Frechette's proffer of such information includes only his hourly wage -- which, the district court observed, "provides no information about other assets that might have been available to [him] in 1996" or "about the 1996 cost of legal services in Lewiston, Maine." Frechette, 372 F. Supp. 2d at 673. Finally, and most importantly, the district court already had a transcript of the plea proceedings, from which it could readily determine whether Frechette had knowingly and intelligently waived his right to counsel.

Nevertheless, Frechette argues that an evidentiary hearing was required under our 2003 decision in United States v. Hartsock, 347 F.3d 1. Frechette overreads Hartsock. In Hartsock, we remanded to the district court for a hearing under Rule 104(a) of the Federal Rules of Evidence, id. at 10, because the parties did not have access to a transcript or a recording of the plea proceedings and had agreed to allow the district court to hold a Rule 104(a) hearing to recreate the state court record, id. at 4. While Hartsock permits a district court to hold an evidentiary hearing in such cases, it certainly does not compel a district court to hold an evidentiary hearing, especially when a true and accurate transcript of the relevant proceedings is available and is a sufficient basis for determining whether the waiver of counsel was knowing and intelligent.

On the basis of the record before us, Frechette "knowingly and intelligently waived the right to counsel," within the meaning of 18 U.S.C. § 921(a)(33)(B)(i)(I).

## III.

We reverse the district court on the question of whether Frechette knowingly and intelligently waived his right to a jury trial, affirm the district court's denial of Frechette's request for an evidentiary hearing, affirm the district court's alternate determination that under the federal constitutional standard Frechette knowingly and intelligently waived his right to counsel, vacate the order of dismissal, and remand for proceedings consistent with this opinion.